IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Blockquarry Corp. f/k/a ISW Holdings, Inc., <br><br>     Plaintiff, <br><br> v. <br><br> Litchain Corp. and Gaffney Board of Public Works, <br><br>     Defendants. | Civil Action Number: <br><br><br> **COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTION, AND DAMAGES** <br><br> *(Jury Trial Demanded)* |

Plaintiff Blockquarry Corp. f/k/a ISW Holdings, Inc. requests declaratory and injunctive relief relative to matters effecting Defendants Litchain, Inc. and Gaffney Board of Public Works and sues Defendants Litchain, Inc. for damages and alleges as follows.

## **PARTIES, JURISDICTION, AND VENUE**

1.    Plaintiff Blockquarry Corp. f/k/a ISW Holdings, Inc. ("Blockquarry") is a corporation organized under the laws of Nevada.  The company is authorized to transact business in the state of South Carolina and maintains a principal place of business in Texas.[1]

2.    Defendant Litchain Corp. ("Defendant") is a corporation organized under the laws of Florida.  The company is authorized to transaction business in the state of South Carolina and maintains a principal place of business in Florida.

3.    Defendant Gaffney Board of Public Works (the "Utility") is a municipal corporation organized under the laws of South Carolina.  The Utility maintains a principal place

---

[1] During 2021, Blockquarry caused a name change to occur with the Nevada Secretary of State, changing the corporation's name from ISW Holdings, Inc. to Blockquarry Corp.

of business in South Carolina and was founded to provide electric, water, and sewer public utility services to customers within its retail service territory.

4.       This Court has subject matter jurisdiction over the instant case because all parties are diverse, including each plaintiff as to each defendant, and the amount in controversy exceeds $75,000.00.  *See* 28 U.S.C.A. § 1332.

5.       The Court has personal jurisdiction over the Utility because it is a municipal corporation organized under the laws of South Carolina and because it maintains a principal place of business in South Carolina.

6.       The Court has personal jurisdiction over Defendant because Defendant regularly conducts business in South Carolina by, among other ways, contracting with the Utility and, purportedly, Blockquarry for various performances due in the state of South Carolina.

7.       Venue is proper in this Court because a substantial part of the events or omissions giving rise to the instant claim occurred in Cherokee County, South Carolina and a substantial part of property that is the subject of the action is situated in Cherokee County, South Carolina.  *See* 28 U.S.C.A. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A.    Bitcoin Mining, Generally

8.       The acts and omissions involved in the instant case relate to Bitcoin mining.

9.       Bitcoin is a digital currency that uses blockchain technology to support peer-to-peer transactions between users on a decentralized network.  Bitcoin is money—that can (and does) thrive without the guarantees of a national central bank.

10.      Bitcoin is relatively risk free because ownership of the currency is verified and recorded by a public digital ledger.  The ledger perpetually grows as new transactions and exchanges take place.

2

11.    Bitcoin "miners" maintain and verify the ledger for a fee that is paid in Bitcoin.

12.    The ledger is maintained and verified, digitally, by mining servers owned or operated by miners.  The servers are continually running complex mathematical equations required to solve for and publish new blocks of Bitcoin transactions on the ledger.

13.    Operating the server equipment for Bitcoin mining requires an immense amount of electrical power.  *See, generally, infra* ¶ 33.  Consequently, power supply contracts are paramount considerations for Bitcoin miners.

14.    It is common for development companies to prepare sites for cryptocurrency mining operations, in the same way a real estate development company may prepare unimproved land for subdivision and sale.

15.    A development company may contract for the real estate, utility services (primarily electrical power), and housing for cryptocurrency mining servers, even though the mining servers may be owned by third parties.  Housing in this context often refers to providing mining "pods." *Pods* are, typically, converted shipping containers equipped with cooling, server racking, and coupling points for utility services.  The mining *servers* are installed in the pods when development is complete.  In this relationship, the owners of the mining servers are the miners that earn a fee for maintaining and verifying the Bitcoin ledger (not the development company).

**B.    Blockquarry pays Defendant $300,000 for identifying and delivering premises for cryptocurrency mining operations on the Utility's real property.**

16.    Blockquarry is a cryptocurrency mining development company, as described in ¶ 15 above.  Its primary business purpose is to provide its clients with cryptocurrency mining development services in the United States.

17.    During early October 2021, Blockquarry's business associates approached the company with a potential site for new cryptocurrency mining operations.  The proposed site was being offered by Defendant.

18.    Defendant represented it was offering to lease real property suited for cryptocurrency mining, as the site was located adjacent to a distribution-level electrical substation.

19.    The site's proximity to a substation made it highly attractive to Blockquarry, given the likelihood that the substation could serve high-demand electrical processes with little need for additional or supplemental power systems upgrades.

20.    On or about October 18, 2021, Blockquarry executed a written document, whereby Defendant purported to sublease real property owned by the Utility to Blockquarry, located at 154 Hyatt Street in Gaffney, Cherokee County, South Carolina (the "Premises"), for the purpose of a Bitcoin mining operation.  The purported sublease is discussed in greater detail *infra* at § H.

21.    The Utility owns and operates a distribution-level electrical substation on or adjacent to the Premises, called the 'Suez Station.'

22.    On or about October 18, 2021, Blockquarry executed a written document, whereby Defendant purported to license to Blockquarry an attractive rate offered by the Utility for electrical usage and demand consumed on the Premises.[2]  The purported license agreement is discussed in greater detail *infra* at § I.

23.    Unknown to Blockquarry—at that time—Defendant had secured the following agreements relative to the Premises.

---

[2] The rate is called an 'economic development incentive rate' and is a tool for participating municipal utilities to offer incentives for new customers with high-demand profiles to enter their retail service territories.

- On or about September 8, 2021, the Utility and Defendant entered an electric service agreement for electrical service for the Premises. The electric service agreement is discussed in greater detail *infra* at § J and provides for the same attractive rate provided for in the purported license agreement.

- On or about September 28, 2021, the Utility and Defendant entered a ground lease for the Premises.

24. Blockquarry funded a $300,000 fee paid to Defendant for identifying the Premises as a Bitcoin mining site. The fee was *not* paid part and parcel to or as a requirement of the purported sublease or purported license agreement.

**C. Blockquarry expends nearly $7.4 million for Bitcoin mining on the Premises.**

25. Blockquarry funded $1,387,895.20 as a deposit on the Premises' utility bill (the "Deposit"). Approximately $1,000,000 this amount was paid by Blockquarry, directly, to the Utility. The remainder was paid by Blockquarry's contractor, directly, to the Utility.

26. The deposit was required under the electric service agreement between BPW and Defendant. *See infra* ¶ 94.

27. The Utility remains in possession of the Deposit.

28. In addition to the Deposit, Blockquarry paid approximately $6 million to a third party contractor for:

- various improvements to the Premises, including for site clearing and build out of the Premises;

- the purchase, delivery, and installation of distribution transformers required to condition and deliver usable electrical power for Bitcoin mining, and

- for the purchase, delivery, and installation of mining pods.

5

29.    Blockquarry owns personal property kept on the Premises, including at least five distribution transformers, ten mining pods, and Bitcoin mining servers.  Blockquarry's Bitcoin mining servers are kept in a storage facility on the Premises.

30.    Additionally, Blockquarry's clients own personal property kept on the Premises, including over 5,000 Bitcoin mining servers installed in Blockquarry's mining pods.  Blockquarry is the bailee of its client's personal property kept on the Premises.

**D.    Blockquarry mines for Bitcoin on the Premises and pays rent and utility bills directly to the Utility.**

31.    Blockquarry (and/or its client(s)) began Bitcoin mining on the Premises during March 2022.

32.    Defendant gave Blockquarry's contractor access to an online portal for reconciliation and payment of the invoices and bills from the Utility relative to the Premises.

33.    Blockquarry paid the Utility, directly, over $2.2 million in fees for utility services, exclusive of the Deposit.

34.    Blockquarry also paid the Utility, directly, $3,000 in monthly rent payments.  *See infra* ¶ 73.

35.    Blockquarry paid the fees for utility services and monthly rent payments by using the Utility's website and by making check payments that were overnighted to the Utility.

36.    Blockquarry understood—and had justifiable reason to believe, given the purported license agreement—that *all* money paid by Blockquarry to the Utility was paid for Blockquarry's benefit.

37.    Moreover, the Utility *knew* Blockquarry was making payments, directly, to the Utility for utility services and monthly rent.

38.     Blockquarry has *not* paid Defendant *any* money under the purported sublease or purported license agreement.  All payments have been made by Blockquarry directly to the Utility or by Blockquarry's contractor directly to the Utility.

39.     On information and belief, Defendant has not paid the Utility any money relative to the Premises.

40.     On or about April 11, 2022, Blockquarry contracted with a management company to maintain the Premises and to maintain the Bitcoin mining operations located on the Premises for a fee of $65,000 per month.[3]  Blockquarry paid the management company accordingly.

41.     Blockquarry also reimbursed the management company for various costs associated with maintenance.

**E.     Defendant attempts to extort money from Blockquarry.**

42.     Sometime around December 2022, Defendant's principal, Tony Tate ("Tate"), determined, apparently, that he was dissatisfied with Defendant's position relative to Blockquarry and the Utility.

43.     Tate changed the administrative credentials to the online payment portal, blocking Blockquarry and its management company's access to the Utility's billing.   Thereafter, Blockquarry and its management company would have no information relative to the Utility's charges for services.

44.     At the same time, Tate begins delivering Blockquarry erratic, threatening messages demanding large amounts of money.

---

[3] The management company and the contractor discussed in ¶ 28 *supra* are the same entity.

7

45.     On December 21, 2022, Tate sent Blockquarry an email stating "we revoked" the purported sublease and license agreements, and that Defendant and/or Tate would "lock down" the Premises and inform the Utility to stop delivering electrical power to the Premises.

46.     On December 27, 2022, Tate delivered Blockquarry an email stating "we have revoked the agreements" and that the purported license agreement is revoked, and demanding payment of nearly $100,000—an amount which is, purportedly, a "10% Good Faith Deposit."

47.     On January 5, 2023, Tate sent Blockquarry an email:

- stating "I will be initiating . . . eviction" for, allegedly, not curing alleged defaults that Defendant purportedly noticed on December 7, 2022, December 16, 2022, and December 27, 2022;

- stating Defendant is assessing over $1.4 million against Blockquarry, exclusive of administrative fee and penalties, on ground of alleged breaches of the purported sublease and purported license agreement;

- stating "we will be locking down the site and advising [the Utility] to keep the power shut off . . . [;]" and

- demanding information from Blockquarry relative to the company's plan to vacate the Premises.

48.     On January 9, 2023, Tate delivered Blockquarry and email claiming that over $157,000.00 is past due and owing for utility services and $2,899 is past due and owing for rent payments under the purported sublease. The email provided *the Utility's* ACH payment information and demanded that Blockquarry make payment to the Utility.

49. On January 10, 2023, Tate delivered Blockquarry an email stating, among other things, he considers the Premises abandoned—due, apparently, to "nonpayment of bills"—and that "we're moving forward with eviction."

50. On January 19, 2023, Tate delivered Blockquarry an email accusing Blockquarry of a material breach; claiming that the "total amount of indebtedness accrued by [Blockquarry] for non-payment and failing to perform as agreed is $1,879,304.61[;]" and demanding a half payment on a total amount of $995,767.20 to avoid eviction.

51. The same email claims $883,537.41 is due and payable to the Utility, despite that Tate claimed days earlier that a mere $157,000.00 was past due and owning for utility services.

52. Defendant has refused and continues to refuse to substantiate claims levied in its correspondence (with documents or otherwise), notwithstanding requests from Blockquarry.

53. Defendant's conduct—*e.g.*, demanding the payment of nearly two million dollars in exchange for Defendant's avoidance of legal process it has no entitlement to pursue—is extortion.

54. Blockquarry is not indebted to Defendant and owes no duty of performance to Defendant.

**F.**    **The Utility stops electrical service to the Premises; refuses to return the Deposit to Blockquarry; and locks Blockquarry out of the Premises.**

55. During January 2023, the Utility stopped electrical service to the Premises.

56. On January 9, 2023, the Utility delivered a letter to Defendant advising it cutoff the Premises' electricity for nonpayment; identifying Defendant's defaults under the September 23 ground lease and stating "[the Utility] did *not* approve of or consent to sublease" to Blockquarry.

57. Sometime after February 16, 2023, the Utility padlocked the Premises, blocking any physical access to the Premises for Blockquarry (and, presumably, any other third party).

58.     The Utility has refused and continues to refuse to return the Deposit to Blockquarry, despite demand from .

59.     The Utility informed Blockquarry it will return the Deposit paid by Blockquarry to its customer—*i.e.*, Defendant—*not* to Blockquarry.

60.     The Utility further informed Blockquarry it will return the Deposit paid by Blockquarry to Litchain *before* April 14, 2023.

61.     Since the Utility has discontinued electrical and other utility services on the Premises and has never turned the power back on, the Utility has no need, requirement, or right to retain the Deposit paid by Blockquarry.

**G.    Litchain attempts to evict Blockquarry and dupe the Utility into returning the Deposit to Litchain.**

62.     On or about February 3, 2023, Litchain caused an eviction action to be filed against Blockquarry relative to the Premises in the Magistrate Court of Cherokee County, South Carolina (bearing case number 2023CV1110100285) (the "Eviction Action").  The rule to vacate filed in the Eviction Action is attached hereto as *Exhibit A* and sworn to by Defendant's counsel.

63.     Blockquarry opposed the eviction and demanded a jury trial.

64.     On or about March 13, 2023, the Utility delivered a letter to Defendant stating, "Effective immediately, the Lease is terminated[]" (emphasis in original), and stating that future access of the Premises by Litchain will be treated as a trespass.

65.     On March 14, 2023, Litchain delivered an email to the Utility's counsel requesting that the Utility cut a check for the Deposit to Litchain and provided the company's address for delivery of the same.

66.     Litchain's March 14, 2023 was an unlawful attempt to convert the Deposit for Litchain's improper use.

**H.    Terms of the Purported Sublease between Blockquarry and Defendant**

67.    A true and correct copy of the written agreement purporting to convey a sublease for the Premises is attached hereto as *Exhibit B*.  The agreement is hereinafter cited as "Ex. B."

68.    The agreement references a 'master lease' between the Utility and Defendant—dated September 23, 2021—for the Premises and represents and warrants Defendant was able to convey a leasehold interest in the Premises.  (Ex. B §§ A., 2.13, and 15.8.)

69.    The agreement is subordinate to the purported 'master lease' and incorporates its terms and conditions.  (Ex. B §§ 2.1. and 2.2.)

70.    The agreement is "conditioned upon the consent . . . by [the Utility,] which consent shall evidenced by [the Utility's] signature appended hereto or a separate consent . . . ."  (Ex. B § 1.4.)  The agreement further provides Blockquarry and/or Defendant may cancel the agreement upon written notice, in the event Defendant does not receive the Utility's consent.  (*Id.*)

71.    The purported sublease is terminated in the event the 'master lease' is terminated. (Ex. B §§ 2.3.)

72.    The term of the purported sublease is approximately eight years, commencing upon the later of October 1, 2021 and the Utility's consent, and expiring on September 30, 2029.  (Ex. B § 1.4.)

73.    The agreement requires Blockquarry to pay rent in the amount of $3,000 per month. (Ex. B § 1.1.(b).)

74.    The agreement requires Defendant to produce to Blockquarry notices provided to Defendant from the Utility.  (Ex. B § 2.11.)

75.    The agreement provides that South Carolina law controls.  (Ex. B § 15.7.)

76.    The agreement was drafted by Defendant.

77.     Except for the terms provided above, the agreement is ambiguous and unclear.  It is unusually verbose and difficult to decipher and appears to contain elements of a pro forma document that were not edited or removed for purposes of the instant transaction.  (*See, e.g.,* Ex. B § 2.7.)

78.     Adding to the confusion, the purported sublease devotes pages of terms that were waived by Defendant.  (*See, e.g.,* Ex. B at Article VIII [Security].)

**I.     Terms of the Purported License Agreement between Blockquarry and Defendant**

79.     A true and correct copy of the written agreement purporting to convey a license for the use of an 'economic development incentive rate' is attached hereto as *Exhibit C*.  The agreement is hereinafter cited as "Ex. C."

80.     This is the same rate referred to in ¶ 22 above.

81.     The agreement references a "special agreement with Gaffney Board of Public Works' (the Utility)" along with the applicable rate schedule and purports to convey "a revocable license for the use of the benefits of the [agreement with the Utility]."  (Ex. C § 2.)  This references the electrical service agreement between the Utility and Defendant, which is discussed further *infra* § J.

82.     The term of the agreement is five years or until the purported license is revoked by Defendant.  (*Id.*)  Revocation by Defendant requires sixty-days' notice.  (*Id.*)

83.     The agreement purports to eliminate a claim for damages arising from termination of the purported license.  (*Id.*)

84.     The agreement does not require or otherwise demand the exchange of any payment.  (Ex. C § 3.)

85. The agreement requires Blockquarry to remit special benefit payments received to the Utility.  (Ex. C § 5.)

86. Curiously, the agreement also purports to convey an interest in real estate—presumably, the Premises.  (Ex. C § 6.)

87. The agreement provides for attorneys' fees to the prevailing party while enforcing the agreement.  (Ex. C § 10.)

88. The agreement provides that South Carolina law controls.  (Ex. C § 12.)

89. The agreement was drafted by Defendant and thereafter provided to Blockquarry.

90. Except for the terms provided above, the agreement is ambiguous and unclear.  It contains, among other things, several incomplete sentences.  (*See, e.g.,* Ex. C § 6.)

**J.    Terms of the Electrical Service Agreement between Defendant and the Utility**

91. A true and correct copy of the written agreement for electrical service by the Utility to serve the Premises is attached hereto as *Exhibit D*.  The agreement is hereinafter cited as "Ex. D."

92. According to the electrical service agreement the Premises are to take electrical service under the Utility's 'economic development incentive rate' and 'credit for new loads,' provided that the Premises' peak demand exceeds 750 kilowatts.  (Ex. D p. 12, § 2.1.)

93. The term of the agreement is for eight years.  (Ex. D § 4.1.)

94. The agreement requires a deposit equal to the Premises "two highest month utility bill average."  (Ex. D § 7.1.)

95. The agreement states, "[Defendant] is choosing to provide it own distribution transformers (2500 KVA/416 v)."  (Ex. D § 6.3.)

96.     These are the distribution transformers purchased, delivered, and installed by Blockquarry on the Premises. *See supra* ¶ 28.

## **COUNT 1**

**REQUEST FOR DECLARATORY JUDGMENT RELATIVE TO THE DEPOSIT, THE PERSONAL PROPERTY ON THE PREMISES, AND ALLEGED INDEBTEDNESS TO DEFENDANT AND THE UTILITY**

*(As to Defendant and the Utility)*

97.     Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

98.     This is an action under 28 U.S.C.A. §§ 2201 and 2202 to resolve a case and controversy by and between Blockquarry, Defendant, and the Utility (collectively, the "Parties").

99.     There is a case of actual, justiciable controversy between the Parties—that is substantial, definite, and concrete—relative to: (i) the Deposit paid by Blockquarry, (ii) Blockquarry's personal property on the Premises, and (iii) real improvements made by Blockquarry to the Premises (to the extent they are not fixtures). Blockquarry enjoys a legally protected interest with respect to these matters.

100.     The threat of an injury in fact to Blockquarry—if these issues are not resolved by the Court issued declaratory relief—is actual and imminent, not conjectural or hypothetical.

101.     A declaratory judgment in the instant case will be useful; there is a sufficient practical need for it; and the judgment will finally determine the rights of the Parties.

102.     The Deposit belongs to Blockquarry and should be returned immediately to Blockquarry.

103.     Defendant's attempted extortion of Blockquarry and conversion of the Deposit, among other conduct, demonstrates that—if the Deposit is returned to Defendant—Defendant will either abscond with the cash or use it to continue exploiting Blockquarry.

14

104.    Blockquarry maintains the personal property on the Premises valued at well over $1 million. *See supra* ¶¶ 28-29.

105.    Blockquarry improved the Premises by *inter alia* installing distribution transformers required to condition electrical power for Bitcoin mining.

106.    Blockquarry does not have an adequate remedy at law with respect to the Deposit paid by Blockquarry, the maintenance and protection of Blockquarry's personal property, including the distribution transformers.

WHEREFORE Blockquarry requests this Court enter judgment:

A.    declaring Blockquarry is the rightful owner of the Deposit paid by Blockquarry;

B.    declaring Blockquarry is the rightful owner of its personal property on the Premises, including the Bitcoin mining pods, the distribution transformers, and other personal property not affixed to the Premises;

C.    declaring Blockquarry caused and paid for real improvements to be affixed to the Premises;

D.    declaring Blockquarry is not indebted to Litchain for any amount of money or other obligation;

E.    declaring Blockquarry is not indebted to the Utility for any amount of money or other obligation;

F.    taxing against Defendant Blockquarry's attorneys' fees and costs under 28 U.S.C.A. § 2202 and S.C. CODE ANN. § 15-53-100; and

G.    awarding any other relief the Court deems appropriate.

## COUNT 2

## DECLARATORY JUDGMENT RELATIVE TO THE PURPORTED SUBLEASE

### *(As to Defendant)*

107.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

108.    This is an action under 28 U.S.C.A. §§ 2201 and 2202 to resolve a case and controversy by and between Blockquarry and Defendant.

109.    There is a case of actual, justiciable controversy between Blockquarry and Defendant—that is substantial, definite, and concrete—with respect to the rights and obligations flowing from the purported sublease.  Blockquarry enjoys a legally protected interest relative to the money paid and other obligations it incurred by way of the purported sublease.

110.    The threat of an injury in fact to Blockquarry—if these issues are not resolved by the Court issued declaratory relief—is actual and imminent, not conjectural or hypothetical.

111.    A declaratory judgment in the instant case will be useful; there is a sufficient practical need for it; and the judgment will finally determine the rights between Blockquarry and Defendant, generally, and with respect to money paid and other obligations it incurred by way of the purported sublease.

112.    The purported sublease is void, voidable, and further unenforceable because, among other reasons, Defendant cancelled, terminated, and revoked the purported sublease; Defendant never had the Utility's consent for the purported sublease, despite Defendant's representations otherwise; and the Utility cancelled, terminated, and revoked the master lease with Defendant.

WHEREFORE Blockquarry requests this Court enter judgment:

1.      declaring that purported sublease is void, voidable, and further unenforceable;

2.      taxing against Defendant Blockquarry's attorneys' fees and costs under 28 U.S.C.A. § 2202 and S.C. CODE ANN. § 15-53-100; and

3.      awarding any other relief the Court deems appropriate.

## COUNT 3

## DECLARATORY JUDGMENT RELATIVE TO THE PURPORTED LICENSE AGREEMENT

### *(As to Defendant)*

113.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

114.    This is an action under 28 U.S.C.A. §§ 2201 and 2202 to resolve a case and controversy by and between Blockquarry and Defendant.

115.    There is a case of actual, justiciable controversy between the Parties—that is substantial, definite, and concrete—with respect to the rights and obligations flowing from purported license agreement.  Blockquarry enjoys a legally protected interest relative to the money paid and other obligations it incurred by way of the purported license agreement.

116.    The threat of an injury in fact to Blockquarry—if these issues are not resolved by the Court issued declaratory relief—is actual and imminent, not conjectural or hypothetical.

117.    A declaratory judgment in the instant case will be useful; there is a sufficient practical need for it; and the judgment will finally determine the rights of the Parties, generally, and with respect to money paid and other obligations incurred by way of the purported license agreement.

118.    The purported license is void, voidable, and further unenforceable because, among other reasons, it is not supported by consideration and the purported license agreement precludes a claim for damages.  Moreover, Defendant cancelled, terminated, and revoked the purported license agreement; Defendant never had the Utility's consent for the purported license agreement; and the Utility cancelled, terminated, and revoked the electrical service agreement between the Utility and Defendant.

WHEREFORE Blockquarry requests this Court enter judgment:

A.    declaring the purported license agreement is void, voidable, and further unenforceable;

B.    taxing against Defendant Blockquarry's attorneys' fees and costs under 28 U.S.C.A. § 2202 and S.C. CODE ANN. § 15-53-100; and

C.    awarding any other relief the Court deems appropriate.

## REQUEST FOR INJUNCTIVE RELIEF

### *(As to Defendant and the Utility)*

119.    Blockquarry incorporates by this reference all the other allegations contained in this Complaint.

120.    Blockquarry seeks injunctive relief from the Court requiring the Utility and/or Defendant to return—to Blockquarry—the Deposit and personal property on the Premises.

121.    Blockquarry demonstrated a likelihood of success on the merits as to the foregoing claims for relief, based on the allegations set forth in this pleading.

122.    Blockquarry is without an adequate remedy at law relative to the return of the Deposit and personal property on the Premises for and among other reasons it is the bailiff of some of the personal property on the Premises

18

123.    Blockquarry will suffer immediate and irreparable harm if the Deposit is not returned, if the Deposit is returned to Litchain, and if the personal property on the Premises is not returned to Blockquarry.  This is evidence by, among other reasons, the Eviction Action and attempt to convert Blockquarry's Deposit.

124.    No harm will be suffered from the issuance of an injunction, as requested herein.

125.    Greater harm will be suffered by Blockquarry if injunctive relief is not granted. The balance of equities tip in Blockquarry's favor.

126.    Granting the injunctive relief is in the public interest.

WHEREFORE Blockquarry requests this Court enter judgment:

A.    requiring the Utility and/or Defendant to immediately return to Blockquarry the Deposit;

B.    enjoining the Utility from returning the Deposit to Litchain;

C.    requiring the Utility and/or Defendant to immediately return to Blockquarry the personal property on the Premises, including the Bitcoin mining pods, the distribution transformers, and other personal property not affixed to the Premises

D.    enjoining the Utility from returning the personal property on the Premises to Litchain;

E.    taxing against Defendant Blockquarry's attorneys' fees and costs; and

F.    awarding any other relief the Court deems appropriate.

## COUNT 4
### WRONGFUL EVICTION
*(As to Defendant)*

127.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

128.    The Eviction Action is wrongful and unlawful on the following grounds:

- by causing a breach of the purported master lease;

- by not providing requisite notice, including notices produced by the Utility;

- by refusing to provide information relative to the master lease;

- by interfering with Blockquarry's quiet enjoyment of the Premises;

- by failing to achieve and not achieving the Utility's consent with the sublease;

- by representing and warranting Defendant could lawfully enter the sublease, while not enjoying the Utility's consent to the sublease; and

- by blocking Blockquarry's access to the online portal for payment of rent and utility fees; and

- by instructing the Utility to cut off the power; and

- by instructing the Utility not to communicate with Blockquarry.

129.    The Eviction Action caused Blockquarry damages.

WHEREFORE Blockquarry requests this Court enter judgment against the Defendant for damages or, alternatively, damages, costs, and any other relief the Court deems appropriate.

## COUNT 5
## ABUSE OF PROCESS
### *(As to Defendant)*

130.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

131.    Defendant's filing of the eviction action (*see supra* ¶ 62) relative to Blockquarry's use of the Premises is a misuse of the legal system for an ulterior purpose that is not proper in the regular conduct of the proceeding.

132.    Defendant had no legal or equitable right to attempt to evict Blockquarry from the Premises. Defendant knew at the time it filed the eviction action, among other things: (i) that the Utility had never consented to the purported sublease; (ii) that Defendant had never once paid for rent under the master lease; (iii) that Defendant had never once paid for electrical service under the electric service agreement; (iv) that Blockquarry paid the Deposit; (v) that the Utility had delivered Defendant notice that it would terminate the master lease; and (vi) that Defendant had purportedly terminated the purported sublease.

133.    Defendant has further maintained the eviction action notwithstanding that the Utility terminated the master lease. *See supra* ¶ 64.

134.    Defendant filed the eviction action and has maintained the same action primarily to accomplish a purpose for which it is not designed, namely, to coerce the achievement of a collateral advantage—*i.e.*, to continue to unlawfully attempt to extort money from Blockquarry and to convert the Deposit to its own improper use, among other things.

135.    Defendant's abuse of process caused Blockquarry damages.

136.    Blockquarry anticipates amended the instant complaint to allege a cause of action for malicious prosecution if and when the eviction action is dismissed in Blockquarry's favor.

WHEREFORE Blockquarry requests this Court enter judgment against the Defendant for damages or, alternatively, damages, costs, and any other relief the Court deems appropriate.

### JURY DEMAND

Blockquarry requests a jury trial on all issues so triable.

Respectfully submitted,

April 7, 2023

FOX ROTHSCHILD LLP

2 W. Washington Street
Suite 1100
Greenville, SC 29601
Tel:   864.751.7600

Greenville, South Carolina

*/s/ R. Taylor Speer*

R. Taylor Speer
Federal ID# 12267
tspeer@foxrothschild.com

William A. Neinast
Federal ID# 13172
wneinast@foxrothschild.com

*Attorneys for Blockquarry Corp. f/k/a ISW Holdings, Inc.*

144394496

22