**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| Blockquarry Corp. f/k/a ISW Holdings, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Litchain Corp. and Gaffney Board of Public Works, <br><br> Defendants. | C/A No.: 7:23-cv-01427-TMC <br><br> **PLAINTIFF'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> **(expedited hearing requested)** |

Plaintiff Blockquarry Corp. f/k/a ISW Holdings, Inc. ("Plaintiff" or "Blockquarry"), by and through its undersigned counsel, hereby submits this Memorandum of Law in support of its FED. R. CIV. P. 65 Emergency Motion for Temporary Restraining Order and Preliminary Injunction.[1] Because the imminent dissipation of more than $1.3 million of Plaintiff Blockquarry's funds and the continued unlawful retention of Blockquarry's personal property are likely to result in irreparable harm, Blockquarry seeks emergency injunctive relief from the Court and requests that its Motion be granted.

## NATURE OF THE CASE

This case arises out of a cryptocurrency mining business dispute. Defendant Litchain Corp. ("Defendant Litchain") and/or Defendant Gaffney Board of Public Works (the "Utility") have unlawfully retained and/or converted (1) funds that Plaintiff Blockquarry paid the Utility as a

---

[1] Plaintiff has contemporaneously filed a Declaration of its President, Alonzo Pierce, including several pertinent exhibits. Plaintiff incorporates the same herein by reference and respectfully requests that the Court read all such filings in conjunction with its Motion and this Memorandum.

deposit for commercial electrical service, and (2) substantially valuable personal property. Defendant Litchain has further abused process by trying to illegally evict Plaintiff from commercial premises. Plaintiff Blockquarry has brought the case at bar seeking declaratory judgment, injunctive relief, and raising two further causes of action against Defendant Litchain for wrongful eviction and abuse of process.

## FACTUAL BACKGROUND

Plaintiff Blockquarry is a cryptocurrency mining development company. Compl. ¶ 16. Its primary business purpose is to provide its clients with cryptocurrency mining development services in the United States. *Id.* During early October 2021, Blockquarry's business associates approached the company with a potential site for new cryptocurrency mining operations. *Id.* ¶ 17. The proposed site was being offered by Defendant Litchain, which represented that it could essentially serve as a "middle man" and sublease real property to Blockquarry that was uniquely suited for cryptocurrency mining as it was located adjacent to an electrical substation. *Id.* ¶ 18-19.[2] The Utility owned both the property in question (hereinafter the "Premises") and the substation, located in Gaffney, Cherokee County, South Carolina. *Id.* ¶ 20. The Utility is a municipal corporation organized under the laws of South Carolina which was founded to provide electric, water, and sewer public utility services to customers within its retail service territory around Gaffney, and was poised to offer electrical service to the Premises for cryptocurrency mining. *Id.* ¶ 4.

On or about October 18, 2021, Blockquarry executed a written document by which Defendant Litchain purported to license to Blockquarry an attractive special rate for electrical

---

[2] Cryptocurrency mining typically requires substantial power input. *Id.* ¶ 13. Consequently, power supply contracts are paramount considerations for cryptocurrency miners.

usage and demand consumed on the Premises. This rate is called an "economic development incentive rate," and is typically a tool for participating municipal utilities to offer incentives for new customers with high-demand profiles to enter their retail service territories. *Id.* ¶ 22. However, unknown to Blockquarry at that time, Defendant Litchain had already secured two agreements with the Utility: (1) an electrical service agreement on or about September 8, 2021, which afforded the same attractive special rate provided for in the purported license agreement between Blockquarry and Defendant Litchain, and; (2) a ground lease for the Premises. *Id.* at 23. In exchange for identifying the Premises as a suitable cryptocurrency mining site, Blockquarry paid Defendant Litchain a fee of more than $300,000.00. This fee was essentially a "finder's fee," and was not a requirement of the purported sublease or purported license agreement between Blockquarry and Defendant Litchain. *Id.* ¶ 24.

Subsequently, Blockquarry began expending money to set up the Premises for cryptocurrency mining. In total, these expenditures amounted to almost $7.4 million. Most notably, Blockquarry funded $1,387,895.20 as a deposit on the Premises' utility bill (the "Deposit"). Approximately $1,000,000 of this amount was paid by Blockquarry directly to the Utility. *Id.* ¶ 25. The remainder was paid by one of Blockquarry's contractors from Blockquarry's funds directly to the Utility. The deposit was required under the electric service agreement between the Utility and Defendant Litchain. *Id.* ¶ 26. In addition to the Deposit, Blockquarry paid a contractor approximately $6 million for: (1) various improvements to the Premises, including for site clearing and build-out; (2) the purchase, delivery, and installation of heavy-duty distribution transformers required to condition and deliver electrical power that was suitable for cryptocurrency mining, and (3) for the purchase, delivery, and installation of mining "pods," which are containerized installations that house, power, and cool the computer servers which actually "mine" the

cryptocurrency. *Id.* ¶ 15; 28. Blockquarry provides the services of these pods to its clients, who then use the servers in those pods to mine cryptocurrency.

After making the improvements to the Premises, Blockquarry and/or its clients began mining in March 2022. So Blockquarry could determine its bill amount and pay its Utility bills for power consumption, Defendant Litchain provided access to an online payment portal to the Utility. *Id.* ¶ 31 – 32. In total, Blockquarry paid the Utility more than $2.2 million in utility fees, exclusive of the Deposit, as well as $3,000 per month in rent payments. All such payments were made directly from Blockquarry to the Utility, either via the portal or overnighted check. *Id.* ¶ 33 – 34. Blockquarry has never paid Defendant any money under the purported sublease or purported license agreement. All payments have been made by Blockquarry or its contractor directly to the Utility. *Id.* ¶ 38.

The situation took a drastic turn around December 2022. Apparently, Defendant Litchain's principal, Tony Tate ("Tate"), decided that his company's position was unsatisfactory. Tate suddenly and without justification changed the administrative credentials to the online payment portal, blocking Blockquarry and its contractor's access to the Utility's billing. Thereafter, Blockquarry and its contractor would have no information relative to the Utility's charges for services. *Id.* ¶ 42 – 43. At the same time, Tate begins delivering Blockquarry erratic, threatening messages inexplicably demanding large amounts of money. *Id.* ¶ 44; *see also* Decl. of Alonzo Pierce ¶ 21 – 22, Exs. H and I.

When Blockquarry did not cave to these extortionate demands, Tate sent Blockquarry an email stating "we revoked" the purported sublease and license agreements, and that Defendant Litchain and/or Tate would "lock down" the Premises and inform the Utility to stop delivering electrical power to the Premises. Compl. ¶ 45. On December 27, 2022, Tate then delivered

Blockquarry an email stating "we have revoked the agreements" and that the purported license agreement is revoked, and demanding payment of nearly $100,000.00 —an amount which was, purportedly, a "10% Good Faith Deposit.". *Id.* ¶ 46. On January 5, 2023, Tate sent Blockquarry an email:

> • stating "I will be initiating . . . eviction" for, allegedly, not curing alleged defaults that Defendant Litchain purportedly noticed on December 7, 2022, December 16, 2022, and December 27, 2022;
>
> • stating Defendant Litchain is assessing over $1.4 million against Blockquarry, exclusive of "administrative fee and penalties," on ground of alleged breaches of the purported sublease and purported license agreement;
>
> • stating "we will be locking down the site and advising [the Utility] to keep the power shut off . . . [;]" and
>
> • demanding information from Blockquarry relative to the company's plan to vacate the Premises. *Id.* ¶ 47.

On January 9, 2023, Tate delivered Blockquarry an email now claiming that over $157,000.00 was past due and owing for utility services, and $2,899.00 was past due and owing for rent payments under the purported sublease. The email provided the Utility's ACH wire payment information and demanded that Blockquarry make payment to the Utility. *Id.* ¶ 48. On January 10, 2023, Tate delivered Blockquarry an email stating that, *inter alia*, he somehow considered the Premises abandoned—due, apparently, to "nonpayment of bills"—and that "we're moving forward with eviction." *Id.* ¶ 49.

Nine days after this latest threat, Tate delivered Blockquarry an email accusing Blockquarry of a material breach, shockingly and baselessly claiming that the "total amount of

indebtedness accrued by [Blockquarry] for non-payment and failing to perform as agreed is $1,879,304.61[,]" and demanding a half payment on a total amount of $995,767.20 to avoid eviction. *Id.* ¶ 50. The same email claimed that $883,537.41 was due and payable to the Utility, ***despite the fact that Tate claimed only ten days earlier that a mere $157,000.00 was past due and owning for utility services.*** *Id.* ¶ 51.

Defendant Litchain has refused and continues to refuse to substantiate claims levied in its correspondence (with documents or otherwise), notwithstanding requests from Blockquarry to do so. *Id* ¶ 52. During January 2023, the Utility stopped electrical service to the Premises. *Id.* ¶ 55. On January 9, 2023, the Utility delivered a letter to Defendant Litchain advising it cutoff the Premises' electricity for nonpayment; identifying Defendant Litchain's defaults under the September 23 ground lease; and stating "[the Utility] did *not* approve of or consent to sublease" to Blockquarry. *Id.* ¶ 56. Sometime after February 16, 2023, the Utility padlocked the Premises, blocking any physical access to the Premises and personal property therein for Blockquarry (and, presumably, any other third party). *Id.* ¶ 57.

The Utility has also refused and continues to refuse to return the Deposit to Blockquarry, despite demand that it return what is rightfully and plainly Blockquarry's money. *Id.* ¶ 58 – 59; *see also* Decl. of Alonzo Pierce ¶ 29 – 30. The Utility informed Blockquarry it will return the Deposit paid by Blockquarry to its "customer" —*i.e.*, Defendant—*not* to Blockquarry, which actually funded the Deposit directly to the Utility. *Compl.* ¶ 58 – 59; *see also* Decl. of Alonzo Pierce ¶ 29 – 30. The Utility further informed Blockquarry that it will return the Deposit – ***Blockquarry's money –*** to ***Defendant Litchain,*** before April 14, 2023. *Id.* ¶ 60. Since the Utility has discontinued electrical and other utility services on the Premises and has never turned the

6

power back on, the Utility has no need, requirement, or right to retain the Deposit paid by Blockquarry. *Id.* ¶ 61.

On or about February 3, 2023, Defendant Litchain caused an eviction action to be filed against Blockquarry relative to the Premises in the Magistrate Court of Cherokee County, South Carolina (bearing case number 2023CV1110100285) (the "Eviction Action"). The rule to vacate filed in the Eviction Action is attached to Plaintiff Blockquarry's Complaint in the case at bar as *Exhibit A,* and was sworn to by Defendant Litchain's counsel. Blockquarry opposed the eviction and demanded a jury trial. *Id.* ¶ 64.

On or about March 13, 2023, the Utility delivered a letter to Defendant Litchain stating, "Effective immediately, the Lease is terminated[]" (emphasis in original), and stating that future access of the Premises by Defendant Litchain will be treated as a trespass. One day later, Defendant Litchain delivered an email to the Utility's counsel inexplicably requesting that the Utility cut a check for the Deposit to Defendant Litchain and provided the company's address for delivery of the same. *Id.* ¶ 64.

Neither the Utility nor Defendant Litchain have returned the Deposit funds, which are rightfully Blockquarry's. Blockquarry owns personal property that is still being kept on the Premises, including at least five distribution transformers, ten mining pods, and cryptocurrency mining servers. Blockquarry's own servers are kept in a storage facility on the Premises. However, in addition to Blockquarry's own servers, Blockquarry's clients own over 5,000 Bitcoin mining servers installed in Blockquarry's mining pods on the Premises, in addition to other personal property. Blockquarry is the bailee of its client's personal property kept on the Premises. *Id.* ¶ 29 – 30. Despite multiple attempts at resolving this patently unjust farce without Court intervention, Blockquarry was unable to do so, and now turns to the Court for injunctive relief.

## LEGAL STANDARD

The substantive standards for granting a request for a temporary restraining order and entering a preliminary injunction are the same. *See Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994) (applying the preliminary injunction standard to a request for a temporary restraining order). Both "are intended to meet exigent circumstances[.]" *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

"Given [the] limited purpose [of a temporary restraining order and a preliminary injunction], and given the haste that is often necessary . . . , [they are] customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Because [the] proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a [temporary restraining order or] preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017).

## ARGUMENT

**I.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.**

    **A. Defendants have Unlawfully Retained and/or Converted the Deposit and the Personal Property.**

8

Blockquarry is likely to succeed on the merits regarding its declaratory judgment action over the Deposit funds and personal property because neither Defendant can show any valid legal right to those funds or that property. Because the Utility has refused to return the Deposit and locked Blockquarry out of the Premises, it has in essence converted the funds for its own use. To recover in an action for conversion, a court must find that (1) the plaintiff has an interest in the thing converted, and (2) the defendant converted the property to his or her own use (3) without the plaintiff's permission. *SSI Medical Services, Inc. v. Cox,* 301 S.C. 493, 392 S.E.2d 789 (1990). Money may be the subject of an action for conversion where it is capable of being identified. *Id.*

Here, Defendant Litchain and/or the Utility have seized and refused to return Blockquarry's property without permission or justification. Indeed, neither Defendant can put forth any valid reason as to why the Deposit funds, paid directly by Blockquarry and its contractor to the Utility, should not be returned to Blockquarry. Defendant Litchain has no entitlement to these funds, despite its attempts to extort them from Blockquarry and the Utility.

Likewise, there can be no valid claim against the personal property on the Premises. It is the property of Blockquarry and Blockquarry's clients. It is not the Utility's property. It is not Defendant Litchain's property. Blockquarry has assigned no interest in this property to either Defendant. Blockquarry has made no contractual promises regarding this property to either Defendant. Yet Blockquarry finds a padlock between it and its property.

**B. The Purported Sublease is Plainly Void, Voidable, and Unenforceable, and Defendant Litchain has Illegally Evicted Blockquarry.**

Blockquarry is also likely to succeed on the merits of its claims related to the purported sublease because Defendant Litchain cancelled, terminated, and revoked it. A contract will be treated as abandoned when acts of one party inconsistent with its existence are acquiesced in by the other party. Abandonment of a contract need not be express, but may be inferred from the

conduct of the parties and attendant circumstances. *U.S. for Use and Benefit of Williams Elec. Co., Inc. v. Metric Constructors, Inc.*, 325 S.C. 129, 480 S.E.2d 447 (1997); *Quality Concrete Products, Inc. v. Thomason*, 253 S.C. 579, 172 S.E.2d 297 (1970). Since South Carolina law recognizes the theory of constructive eviction, a tenant is entitled to vacate leased property and discontinue paying rent if the landlord deprives the tenant of the beneficial use and enjoyment of the property. *E.g., Thomas v. Hancock*, 271 S. C. 273, 246 S. E. 2d 604 (1978); *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F. 2d 253 (4th Cir. 1984) (applying South Carolina law). Forfeiture for a trivial or immaterial breach of commercial lease is not enforced in South Carolina. *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d 364 (1994). A commercial landlord's right to terminate a lease for breach of conditions is not unlimited, and a court's decision to permit termination must be tempered by notions of equity and common sense. *Id.*

Here, the purported sublease is void, voidable, and unenforceable because Defendant Litchain:

1.  Caused a breach of the purported master lease by subleasing;

2.  Caused a breach of the purported master leave by terminating electrical service;

3.  Refused to provide information to Blockquarry about the master lease;

4.  Interfered with Blockquarry's quiet enjoyment of the Premises;

5.  Failed to procure the Utility's consent to sublease, despite Defendant Litchain's representations and warranties that it could lawfully sublease the Premises;

6.  Blocked Blockquarry's access to the online portal for rent and utility fee payment and information;

7.  Instructed the Utility to cut off the power to the Premises;

8.  Instructed the Utility to not communicate with Blockquarry.

10

9. Explicitly revoked the purported sublease. *E.g.,* Compl. ¶ 45; Decl. of Alonzo Pierce ¶ 19 – 20.

Further, Blockquarry is likely to succeed on its abuse of process and wrongful eviction claims against Defendant Litchain. Abuse of process occurs when process, either civil or criminal, is willfully used for a purpose not justified by the law. *Huggins v. Winn-Dixie Greenville, Inc.*, 249 S. C. 206, 153 S. E. 2d 693 (1967), *appeal after remand*, 252 S. C. 353, 166 S. E. 2d 297 (1969); *see also George v. Leonard*, 71 F. Supp. 662 (D.S.C. 1947); *McConnell v. Kennedy*, 29 S. C. 180, 7 S. E. 76 (1888) (similar cases of abuse of process involving attempted extortion). The elements of an abuse of process claim are: (1) ulterior purpose and (2) willful act in use of process (3) not proper in regular conduct of the proceedings. *Davis v. Epting*, 317 S.C. 315, 454 S.E.2d 325 (Ct. App. 1994). Ulterior purpose exists if process is used to gain an illegitimate objective. *Id.*

Here, Defendant Litchain has issued legal process against Blockquarry in the form of the Eviction Action. Defendant Litchain did so while it knew full well that it had failed to obtain the consent of the Utility prior to executing the purported sublease that was the subject of the Eviction Action. Defendant Litchain has even continued to prosecute the Eviction Action ***after the Utility communicated that it had terminated the purported master lease with Defendant Litchain.*** Defendant Litchain willfully did so, and continues to willfully do so, for the ulterior and improper purpose of extorting money from Blockquarry. *See Davis,* 317 S.C. at 315, 454 S.E.2d at 325. This pattern of abusing process is not only unconscionable, but illegal.

**C. The Purported License Agreement is Plainly Void, Voidable, and Unenforceable.**

Blockquarry is also likely to succeed on the merits of its declaratory judgment action regarding the purported license agreement. Valuable consideration is a necessary element of contract formation in South Carolina. *E.g., Roberts v. Gaskins*, 327 S.C. 478, 486 S.E.2d 771 (Ct. App. 1997). A contract will be treated as abandoned when acts of one party inconsistent with its

existence are acquiesced in by the other party. Abandonment of a contract need not be express, but may be inferred from the conduct of the parties and attendant circumstances. *Metric Constructors, Inc.*, 325 S.C. at 129, 480 S.E.2d at 447; *Quality Concrete*, 253 S.C. at 579, 172 S.E.2d at 297.

Here, the purported license is void, voidable, and further unenforceable because, among other reasons, it is not supported by consideration and the purported license agreement precludes a claim for damages. Moreover, Defendant Litchain explicitly cancelled, terminated, and revoked the purported license agreement; Defendant Litchain never had the Utility's consent for the purported license agreement; and the Utility explicitly cancelled, terminated, and revoked the electrical service license agreement between the Utility and Defendant Litchain. *E.g.,* Compl. ¶ 45; Decl. of Alonzo Pierce ¶ 19 – 20.

## II.    PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Plaintiffs need only demonstrate that irreparable harm "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 22 (2008) (emphasis added). Here, Plaintiff can show several types of irreparable harm that flow directly from Defendants' unlawful retention of the Deposit funds and personal property, and Defendant Litchain's illegal eviction. First, Blockquarry will suffer immediate and irreparable harm if the Deposit is not returned. The funds in question are considerable, and indefinitely losing those funds for no benefit will significantly damage Blockquarry financially. More concerningly, if the Deposit is returned to Litchain, it is likely that the funds will dissipate entirely and permanently. Defendant Litchain's conduct—*e.g.*, demanding the payment of nearly two million dollars in exchange for avoidance of legal process it has no entitlement to pursue—is extortion. Defendant Litchain's attempted extortion of Blockquarry and conversion of the Deposit, among other conduct, demonstrates that—

if the Deposit is returned to Defendant Litchain—Defendant Litchain will either abscond with the cash or use it to continue exploiting Blockquarry.

If the personal property on the Premises is not returned to its rightful owner Blockquarry, Blockquarry will suffer significant business interruption because of the loss of use of specialized, expensive cryptocurrency mining servers. Given the inherently fluctuating "strike while the iron is hot" nature of the cryptocurrency market, this interruption would likely prove extremely costly and could deprive Blockquarry of the opportunity to use its servers to generate considerable profit.

Even more pressingly, if Blockquarry's clients' personal property, of which Blockquarry is the bailee, is not returned, the likely irreparable harm could be even more grave. Not only does Defendant and/or the Utility's continued wrongful possession of this property threaten Blockquarry's business and reputation, but it also infringes the property and contract rights of Blockquarry's clients, nonparties. Moreover, most of the property at issue consists of sensitive, expensive, and delicate electronic equipment that requires diligent maintenance in carefully controlled facilities.

Defendant Litchain's erratic, threatening, rapid-fire correspondence demanding immediate payment, coupled with the Utility's ultimatum that it will imminently return the Deposit to Defendant Litchain in clear contradiction to Blockquarry's legal ownership of those funds, establishes that time is of the essence to avoid irreparable harm and preserve the status quo. Without emergency relief from this Court, that will prove impossible.

## III.     THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR, AND GRANTING THE INJUNCTION IS IN THE PUBLIC INTEREST.

Blockquarry will suffer immediate and irreparable harm if the Deposit is not returned, if the Deposit is returned to Litchain, and/or if the personal property on the Premises is not returned to Blockquarry. This is evidenced by, among other reasons, the Eviction Action and attempt to

13

convert Blockquarry's Deposit. No harm will be suffered from the issuance of an injunction, as requested herein, as doing so will only preserve clearly defined property rights and protect the *status quo.* There can be no legitimate harm to Defendants if this Court orders them to remit property that is not theirs in the first place. Greater harm will be suffered by Blockquarry if injunctive relief is not granted, and the balance of equities thus tips in Blockquarry's favor.

Likewise, injunctive relief is in the public interest. There is no public policy interest in allowing extortionate business practices to flourish unchecked. On the contrary, there is great public interest in judicial protection of private property and contract rights, which is merely what Blockquarry is respectfully asking this Court to do.

## CONCLUSION

Plaintiff Blockquarry, its property, and its clients' property all stand to imminently suffer irreparable harm absent an injunction from this Court. Blockquarry therefore respectfully requests the issuance of a temporary restraining order and preliminary injunction against Defendant Litchain and/or the Utility as follows:

A. Ordering the immediate return to Blockquarry of the Deposit, or the deposit of the same with the Court for safeguarding during the pendency of this action, as described in Blockquarry's Complaint in the case at bar;

B. enjoining the Utility from returning the Deposit to Litchain;

C. requiring Defendant Litchain and/or the Utility to immediately return to Blockquarry or deposit at a safe storage facility the personal property on the Premises, including the Bitcoin mining pods, the distribution transformers, and other personal property not affixed to the Premises, as further described in Blockquarry's Complaint;

D. enjoining the Utility from returning the personal property on the Premises to Defendant Litchain; and

E.  awarding any other relief the Court deems appropriate.

Respectfully submitted,

April 6, 2023

FOX ROTHSCHILD LLP

2 W. Washington Street
Suite 1100
Greenville, SC 29601
Tel:   864.751.7600

Greenville, South Carolina

*/s/William A. Neinast*

R. Taylor Speer
Federal ID# 12267
tspeer@foxrothschild.com

William A. Neinast
Federal ID# 13172
wneinast@foxrothschild.com

*Attorneys for Plaintiff Blockquarry Corp. f/k/a ISW Holdings, Inc.*

15