# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| Blockquarry Corp. f/k/a ISW Holdings, Inc., <br><br>  Plaintiff, <br><br> v. <br><br> Litchain Corp. and Gaffney Board of Public Works, <br><br>  Defendants. <br> Gaffney Board of Public Works, <br><br>  Defendant/Counter and Cross-Claimant, <br><br> v. <br><br> Blockquarry Corp. f/k/a ISW Holdings, Inc., <br><br>  Counterclaim Defendant, <br><br> and <br><br> Litchain Corp., <br><br>  Crossclaim Defendant. | C/A No. 7:23-cv-01427-TMC <br><br><br><br> **PROPOSED CROSSCLAIM DEFENDANT CRYPTO INFINITI LLC'S FED. R. CIV. P. 24(a)(2) MOTION TO INTERVENE** |

Pursuant to FED. R. CIV. P. 24(a)(2) Crypto Infiniti LLC ("CI") moves the Court to allow it to intervene as a Crossclaim Defendant to Counts III and IV[1] of Gaffney Board of Public Works's ("Gaffney") Amended Counterclaim & Crossclaim. Specifically, Count III alleges an interpleader action pursuant to FED. R. CIV. P. 22 and 28 U.S.C. § 1335 over the ownership of the bitcoin mining property that is, or was, located at the site operated by Gaffney; Count IV seeks a declaratory judgment as to the proper ownership of the same (hereinafter "Counts III and IV").

---

[1] Count IV is mislabeled as Count III in the Amended Answer and Counterclaim/Crossclaim.

(ECF No. 23, pp. 34-38). As set forth below and in the attached Declaration of Jinwei Zhang, CI owns certain of the property that is the subject of Counts III and IV.

Disposing of Counts III and IV without the involvement of CI will impair or impede CI's ability to protect its ownership interest in the property. Furthermore, none of the parties in this action will represent the interests of CI. Gaffney has filed claims asking the Court to resolve ownership of the subject property. Upon information and belief, Blockquarry Corp. f/k/a ISW Holdings Corp. ("Blockquarry"), is adverse to CI in that it alleges that it is the owner of the subject property. Litchain Corp. has refused to enter an appearance and otherwise defend itself in the action. Accordingly, CI seeks to intervene and respectfully requests that the Court grant its motion.

Pursuant to Fed. R. Civ. P. 24(c), CI submits its proposed pleading that answers Counts III and IV of Gaffney's Amended Counterclaim & Crossclaim. The proposed pleading is attached as **Exhibit 1**.

Pursuant to LOCAL CIV. RULE 7.01, the undersigned conferred with counsel for Gaffney and it does not consent to the relief sought in the motion, conferred with counsel for Blockquarry and it does not consent to the relief sought in the motion, and has not attempted to confer with Litchain Corp. because that party has not appeared in the case and the undersigned does not know who to direct the consultation toward.

I. GENERAL FACTUAL BACKGROUND

CI is in the business of mining for bitcoins. (Declaration of Jinwei Zhang, ¶6, incorporated herein and attached as **Exhibit 2** (hereinafter the "Zhang Dec."). For a company to conduct this business, it must own bitcoin miners and related equipment, including a place to house the bitcoin miners. To house the bitcoin miners, CI purchased specially repurposed shipping containers that were manufactured to house bitcoin miners (the "mining pods"). (Zhang Dec., at ¶16). The act of

bitcoin mining generates a substantial amount of heat; accordingly, the mining pods must be equipped with a cooling system to account for the heat. (Zhang Dec., at ¶10). With the necessary equipment, a company such as CI, must then locate a site where it can place the bitcoin miners and the mining pods (sometimes collectively referred to as "mining equipment"). That site must have a substantial supply of electric energy. (Zhang Dec., at ¶10).

To conduct its business, CI entered into a contract with a company named Bit5ive LLC ("Bit5ive"). (Zhang Dec., at ¶7). Bit5ive's role in the mining was to locate the site where CI could deploy its mining equipment and then oversee and host that site. (Zhang Dec., at ¶8). Hosting includes maintaining the mining equipment and ensuring the cooling system in the mining pods operates correctly. (Zhang Dec., at ¶9).

CI's contract with Bit5ive resulted in CI having approximately 1500 bitcoin miners at 150 Hyatt Street, Gaffney, South Carolina. This address is the site referred to in the pleadings that is owned by Gaffney and where the bitcoin mining operations were located (the "Gaffney Site"). As CI and Bit5ive's relationship progressed, CI transferred approximately 874 bitcoin miners from the Gaffney Site. (Zhang Dec., at ¶15). At some point during Bit5ive or its subcontractor's operation of the Gaffney Site, and upon information and belief, Gaffney's utility bills became delinquent. As a result, and upon information and belief, Gaffney ceased providing power to the Gaffney Site. This resulted in the Gaffney Site being "locked down" and the current litigation. At the time the Gaffney Site was locked down, CI had two mining pods and approximately 560 bitcoin miners located at the site (the "CI Personal Property"). (Zhang Dec., at ¶18).

### CI Monitored the Litigation

CI has monitored the litigation since its inception. At the outset, CI noted the Court's Text Order entered on April 7, 2023. That Text Order stated the following:

3

> The court admonishes all litigants that any party that engages in spoliation of evidence or waste of the personal property at issue in this action, or otherwise dissipates such personal property, tangible or intangible, pending an order of this court does so at its own peril and the court reserves the right to sanction any such conduct.

(ECF No. 9). Thereafter, on April 14, 2023, CI and Bit5ive corresponded by email regarding CI's Personal Property located at the Gaffney Site. (Zhang Dec., at ¶24). On May 8, 2023, CI also corresponded with Blockquarry regarding CI's Personal Property. (Zhang Dec., at ¶42). In July of 2023, CI sent an agent to the Gaffney Site to physically inspect the status of the site and to confirm that it appeared consistent with the representations made by the litigants on the docket. The CI agent confirmed that the Gaffney Site was locked. (Zhang Dec., at ¶43). CI continued to stay in contact with Bit5ive. In and around December of 2023, however, Bit5ive became non-responsive. (Zhang Dec., at ¶44-45).

On January 12, 2024, in a recent filing by Blockquarry, it (Blockquarry) publicly revealed that some or all of the property that is the subject of Counts III and IV, and the above Text Order, were removed from the Gaffney Site. (ECF No. 88, p. 5). Blockquarry wrote that, "[i]t is undisputed Blockquarry was permitted to reenter the Premises [that is, the Gaffney Site], and, on or about November 17, it removed the Bitcoin mining equipment with the authorization of the Utility [that is, Gaffney]." Moreover, and in that same filing, Blockquarry suggested, for the first time, that the publicly filed inventories of the property were incorrect. *See generally* ECF No. 88.

CI learned of the information found in Blockquarry's public filing only after reviewing the public filings. (Zhang Dec., at ¶48). As a result of the developments in the case, CI determined that it had to retain South Carolina counsel and move to protect its property interests.

## II. RULE 24(a)(2) STANDARD

To intervene as a matter of right under FED. R. CIV. P. 24(a)(2), the moving party must show that (1) the application is timely, (2) it has an interest in the subject matter of the action, (3) denial of the motion to intervene would impair or impede the movant's ability to protect that interest, and (4) that interest is not adequately represented by the existing parties. *Houston General Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999); *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Assoc.*, 646 F.2d 117, 120 (4th Cir. 1981).

### A. CI's Motion is Timely

"In order to properly determine whether a motion to intervene in a civil action is sufficiently timely, a trial court in this Circuit is obliged to assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. U.S. Env't Prot. Agency*, 758 F.3d 588, 591 (4th Cir. 2014).

#### 1. *Progress of the Suit*

The litigation has not resolved Counts III and IV related to ownership of the bitcoin mining equipment. The docket makes clear that Blockquarry and Gaffney have resolved their claims against each other. However, the claims that CI seeks to intervene and represent its interests in, remain unresolved. In the latest substantive filing, Gaffney represents that it and Blockquarry have agreed to the following language regarding the property at it issue in Counts III and IV:

> The Court DECLARES that Crossclaim Defendant, Litchain Corp., is not the rightful owner or recipient of the cryptocurrency mining equipment and other personal property remaining at 150 Hyatt Street, Gaffney, South Carolina, when Gaffney Board of Public Works terminated the lease identified in Paragraph 12 of the Amended Counter- and Cross-complaint filed by Gaffney Board of Public Works (ECF No. 23), including all distribution transformers, mining pods, and Bitcoin mining servers.

5

(ECF No. 91, p. 2). The agreed language, however, is silent as to **who is the rightful owner** of the property. This means that Counts III and IV are unresolved. Accordingly, even if the Court grants the pending motion for a default judgment against Litchain, and does so in the manner suggested by the current parties, this issue will remain live and unresolved.

Based on the status of Counts III and IV, those claims have not progressed very far.

2. *Minimal Prejudice*

Allowing CI to intervene will not prejudice any parties. Rather, CI will assist in pushing Counts III and IV toward a resolution as it relates to the property that CI submits that it owns. Indeed, it may be the case that CI and Blockquarry are the only two parties with an ownership interest in the subject property. Accordingly, CI's presence in the litigation may speed up the resolution of Counts III and IV.

As noted above, the current parties have apparently not made meaningful progress in resolving the ownership of the property. CI's entrance as a party to those claims will not prejudice the current parties.

3. *Why Did CI File at this Time*

CI decided to seek leave to intervene at this time because it is concerned that not doing so will result in a loss of its ownership in the subject property. CI incorporates and restates, here, the above section entitled CI Monitored the Litigation and the Zhang Declaration. Further, and as noted above, on January 12, 2024, Blockquarry publicly suggested, for the first time, that the publicly filed inventories of the property were incorrect. [*See generally* ECF No. 88]. Moreover, Blockquarry revealed that some or all of the property that is the subject of Counts III and IV were removed from the Gaffney Site. (ECF No. 88, p. 5). As a result, CI made the decision to intervene.

6

B. **CI Has an Interest in the Subject Matter of the Action**

CI has an interest in the property that is the subject of Counts III and IV. When this litigation commenced, and the Gaffney Site was locked down, CI had approximately 560-577 bitcoin miners and two pod units at the Gaffney Site. (Zhang Dec., at ¶18). The Zhang Declaration, in addition to describing the status of CI and its relationship with the Gaffney Site, includes exhibits that attest to CI's ownership of the subject property. Exhibit A to the Zhang Declaration is email correspondence between CI and Bit5ive. The correspondence makes clear that CI is the owner of two pod units at the Gaffney Site. (Zhang Dec., at ¶24-25, Exhibit A). The Zhang Declaration contains email correspondence between CI and Bit5ive, as recently as November 14, 2023, where Bit5ive provided an inventory of CI's bitcoin miners. (Zhang Dec., at ¶26-27, Exhibit B).

The inventory provided at *Exhibit B* to the Zhang Declaration is the same as the inventory provided by Mr. Donnie L. Hardin at ECF No. 24-4. Specifically, the serial numbers identified on the spreadsheet that Bit5ive provided to CI regarding some of its bitcoin miners located at the Gaffney Site, *Exhibit B*, match the spreadsheet that Mr. Hardin provided in his affidavit located at pages 48-59. (ECF No. 24-4, pp. 48-59. 31). (Zhang Dec., at ¶30). The only difference between these two spreadsheets is that in the one provided in Mr. Hardin's affidavit, there is a notation in the top-right corner that says Blockquarry. (Zhang Dec., at ¶31). CI's position is that it owns the bitcoin miners identified in the spreadsheet located at Exhibit B. Blockquarry does not own those miners. (Zhang Dec., at ¶33). Nor does Blockquarry own the two mining pods. (*See* Zhang Dec., at ¶25).

Through the Zhang Declaration, at *Exhibits C and D*, CI has provided copies of invoices showing that 400 bitcoin miners were shipped direct from the manufacturer (Bitmain Technologies

7

Limited) to the Gaffney Site. (Zhang Dec., at ¶34-37). CI has also provided copies of invoices showing other instances where it direct shipped bitcoin miners from the manufacturer to a Georgia site that Bit5ive hosted for CI before transferring some of its operations to the Gaffney Site. (Zhang Dec., at ¶38-39).

CI has demonstrated that it has an interest in the subject matter of the action.

### C. Denial of the Motion to Intervene Would Impair or Impede CI'S Ability to Protect its Interest

Counts III and IV are live claims and those claims will resolve who is the rightful owner of the subject property. If CI is not allowed to intervene, then it will likely face the battle of rebutting arguments that a settlement or final order in this case creates a *res judicata* bar to a later claim of CI ownership of the subject property. *See Taylor v. Sturgell*, 553 U.S. 880, 892-96 (2008) (describing generally the federal common law of res judicata—that is, claim preclusion and issue preclusion—and the exceptions to the same). Specifically, *Taylor* noted that federal courts have found "nonparty preclusion may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment." *Id.* at 894. The Court noted that "[q]ualifying relationships include, but are not limited to, . . . bailee and bailor, and assignee and assignor." *Id.* It is likely that CI will be required to overcome this precise type of argument in a later filed action. Accordingly, denial of CI's motion will likely impair or impede CI's ability to protect its property interests.

Furthermore, the Court issued a text order instructing the parties to preserve the personal property in this case. (ECF No. 9). The text order means that, if CI proves it is the owner of the subject property, then it (CI) should be able to recover its personal property. If CI is required to litigate its ownership claims in a different court, then, in addition to having to overcome any *res judicata* defenses, it will also have to find a way to regain its personal property. If it is unable to

8

regain its personal property, then CI will likely have to undertake a battle of the experts over what that personal property was worth. This latter exercise will only make CI's pursuit of its personal property more expensive and burdensome. Accordingly, denial of CI's motion will likely impair or impede CI's ability to protect its property interests.

The Court should, respectfully, allow CI to make its claims in this case and resolve the ownership issue of the personal property and Counts III and IV.

### D. CI's Interest is Not Adequately Represented by the Parties

"The burden of establishing th[e] lack of adequate representation is 'minimal.'" *Newport News*, 66 F.2d at 122. CI's interests are not represented, much less adequately represented. Blockquarry, upon information and belief, takes the position that it owns all the subject property located at the Gaffney Site. This position is adverse to CI. Litchain is apparently in privity of contract with CI, through Bit5ive, and therefore, is the one party that *could* adequately represent CI. But it is clear that Litchain will not appear and defend this case. Accordingly, Litchain cannot adequately represent CI's interests. Gaffney has made clear that it does not own the personal property and seeks to have the Court resolve that question. The Court needs an adversarial process to make that determination. Accordingly, CI should be allowed to intervene as there is no other party that will adequately represent its interests.

### III. CONCLUSION

CI contracted with Bit5ive to host bitcoin miners for it at the Gaffney Site. Through no fault of CI, Gaffney shut down the site and padlocked it because Litchain failed to keep the utility payments current. CI owns property that was locked down at the Gaffney Site. CI kept in touch with the relevant parties to protect its property interests. When, on January 12, 2024, Blockquarry suggested that it removed personal property from the Gaffney Site in a public filing, CI decided it

9

had to formally get involved in the case to protect its property interests. CI respectfully requests that the Court grant its motion to intervene.

|  |  |
|---|---|
| March 6, 2024 | Respectfully submitted,<br><br>**BURL F. WILLIAMS, P.A.**<br><br>/s Burl F. Williams<br>Burl F. Williams (D.S.C. Bar No. 10556)<br>201 Riverplace Suite 501<br>Greenville, South Carolina 29601<br>864-546-5035<br>burl@burlfwilliams.com<br><br>*Counsel for Crypto Infiniti LLC* |