IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Blockquarry Corp. f/k/a ISW Holdings, Inc., <br><br>    Plaintiff,<br><br>v.<br><br>Litchain Corp. and Gaffney Board of Public Works,<br><br>    Defendants. | C/A No. 7:23-cv-01427-TMC |
| Gaffney Board of Public Works,<br><br>    Defendant/Counter and Cross- Claimant,<br><br>v.<br><br>Blockquarry Corp. f/k/a ISW Holdings, Inc.,<br><br>    Counterclaim Defendant,<br><br>and<br><br>Litchain Corp.,<br><br>    Crossclaim Defendant. | **PROPOSED CROSSCLAIM DEFENDANT CRYPTO INFINITI LLC'S REPLY TO BLOCKQUARRY'S RESPONSE IN OPPOSITION TO ITS FED. R. CIV. P. 24(a)(2) MOTION TO INTERVENE** |

    The proposed intervenor CI[1] submits this reply to Blockquarry's response in opposition to its motion to intervene.

    **I.    CI'S REPLY STATEMENTS TO BLOCKQUARRY'S RESPONSE**

    The equipment that belongs to CI, and that was locked down after the case was initiated, is worth approximately $3,531,200. (ECF No. 94-2, Zhang Declaration, ¶19, hereinafter "Zhang

---

[1] CI will continue to use the short form names of the parties and witnesses consistent with its opening motion.

1

Dec. ¶__"). CI placed that equipment in Gaffney pursuant to a hosting contract with Bit5ive. CI reasonably relied on Bit5ive's assurances, after the filing of this case, that nothing could be done while the case was pending, and that Bit5ive would retrieve CI's equipment when that became an option. (Zhang Dec. ¶40). CI also provided notice to Blockquarry that it owned equipment at the Gaffney Site. (Zhang Dec. ¶42). CI moved to intervene as soon as it learned that there was a problem with respect to its property. CI reasonably relied on a Court Order that stated none of the property should be moved without a prior Court Order.

Blockquarry presents an entertaining sports analogy to argue CI's motion to intervene should be denied—"Now, on the 99th yard line—and with Litchain out of the picture—Movant finally decides to interject itself and interfere with a touchdown." (Blockquarry Response, at 2). The statement begs the question: what is the "touchdown"? For Blockquarry to use litigation to take possession of approximately $3,531,200 in assets that do not belong to it?

Once CI moved to intervene, Gaffney voluntarily dismissed its interpleader claim regarding the bitcoin mining equipment, (ECF No. 95), and Blockquarry voluntarily dismissed its damages claims against Litchain. (ECF No. 101). These dismissals were, of course, made in the hopes of undermining CI's motion to intervene. Why? CI submits that these coordinated actions were likely taken to avoid scrutiny regarding the location and status of the bitcoin mining equipment.

Notwithstanding these dismissals, Gaffney has a remaining claim for a declaratory judgment "Relating to Return of Deposit Refund and Cryptocurrency Mining Equipment." (ECF No. 23, at 38). That claim seeks a declaratory judgment "as to the manner in which the Deposit Refund and Cryptocurrency Mining Equipment left onsite at 150 Hyatt Street should be distributed." (ECF No. 23, ¶67 (last sentence)). This is a claim that CI seeks leave to intervene and

answer as a crossclaim defendant. (CI Motion, at 2). Accordingly, a live controversy exists that affects CI's property interests.

## II.     CI'S REPLY TO BLOCKQUARRY'S LEGAL ARGUMENTS

Blockquarry opposes only two of the four factors for the Court to consider. Specifically, Blockquarry does not challenge that CI: (2) has an interest in the subject matter of the action, and (4) that interest is not adequately represented by the existing parties. *Houston General Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999). Blockquarry only opposes intervention on the grounds of whether: (1) the application is timely, and (3) denial of the motion to intervene would impair or impede the movant's ability to protect its interest. *Id.* at 839. CI will address the challenged factors in turn.

### A.     CI's Motion Should be Deemed Timely

The premise of Blockquarry's timeliness argument is that the case is essentially over. CI's motion is "too little, and too late." The premise is flawed. As noted above, the parties have not resolved the core issue CI seeks to be heard on—ownership of the bitcoin mining equipment. Instead, Blockquarry and Gaffney have only agreed that Litchain is not the rightful owner. (ECF No. 96-2, Proposed Order, at 4).

The timeliness question must be resolved by analyzing three independent factors. As noted in CI's motion, the factors are as follows: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. U.S. Env't Prot. Agency*, 758 F.3d 588, 591 (4th Cir. 2014).

#### 1.  *How far the underlying suit has progressed.*

Blockquarry and Gaffney have apparently worked out a private deal that allowed Blockquarry to take possession of the deposit monies and the bitcoin mining equipment. Under

their view of the case, it is over. Blockquarry admits, however, that there is a dispute over ownership of the property that is the subject of Gaffney's declaratory judgment claim and CI's motion to intervene. (Blockquarry Response, at 4 n.1). Blockquarry further acknowledges that the "facts continue to develop with respect to [CI's] claim to a possessory interest in [the] Bitcoin miners." (*Id.*). Indeed, it also acknowledges that even after its January 12, 2024, filing that noted "critical inaccuracies that require clarification . . . , *[a]dditional* inaccuracies have been identified." (*Id.*) (emphasis in original). Finally, it notes that discovery would be necessary to resolve this issue. (*Id.*).[2]

Blockquarry makes the fairness argument that CI's motion "utterly fails to atone for Blockquarry and Gaffney BPW's exhaustive effort in this case." (Blockquarry Response, at 7). In support of that argument, it first refers to "several month[s] of settlement negotiations." (Blockquarry Response, at 6). CI does not seek to diminish the efforts of Blockquarry and Gaffney, but the argument needs scrutiny. What were the parties negotiating? Gaffney does not own the bitcoin mining equipment or the utility deposit. What was Gaffney's settlement position that Blockquarry had to overcome?

Second, Blockquarry cites motions practice. It highlights both it and Gaffney's actions in moving the Court to serve Litchain by publication and moving for a default judgment against Litchain. (Blockquarry Response, at 6). Again, CI does not seek to diminish the efforts of

---

[2] Blockquarry qualifies its discovery comment by noting that CI did not present a copy of its hosting agreement. A copy of CI's hosting agreement with Bit5ive that addresses the Gaffney Site is attached as ***Exhibit 1***. Furthermore, a copy of the agreement between CI and a company named Uptime Armory, LLC regarding the purchase of mining pods is attached as ***Exhibit 2***. Gaffney's Amended Complaint, at p.30, ¶ 16, specifically noted that it received utility deposit payments from Uptime Armory. Finally, the Declaration of Keze Li, who works for CI, is attached as ***Exhibit 3***. The Li Declaration provides that CI made over $3M in payments for electricity deposits, hosting services, electric utility payments, and the mining pods during the relevant time. (*Id.* at ¶¶ 5-6). Some of these payments were, of course, directed toward the activities at the Gaffney Site. (*Id.* at ¶ 7).

Blockquarry and Gaffney, but the argument needs scrutiny. Serving a party by publication is a basic part of litigation, and it is not difficult. Moreover, moving for a default judgment against a party that has elected to not even defend itself is not substantive motions practice.

Third, Blockquarry again cites its settlement negotiations with Gaffney. This time, it notes that the parties moved to stay the proceedings. (Response, at 6). Again, it is hard to credit this argument considering that Blockquarry and Gaffney did not have adverse positions regarding the ownership of the utility deposit or the bitcoin mining equipment.

Separate from Blockquarry's Response arguments, it is critical to note two items relevant to the progression of the suit inquiry.

First, Blockquarry and Gaffney are currently in the middle of motions practice over both a factual dispute concerning their clients' sworn statements and a dispute as to whether the filing of these sworn statements (attached as exhibits to Blockquarry's response to Gaffney's motion for partial default judgment) is appropriate at this stage in the matter. The dispute appears to focus on the security, accounting of the bitcoin mining equipment, and the removal of certain cryptocurrency mining equipment. (ECF Nos. 96, 104). The sworn statements and the motions practice, it appears, assign blame for missing or injured bitcoin mining equipment. (*Id.*, ECF Nos. 88-1, 88-2, 88-3, and 96-1). The motions practice reveals that a dispute remains. Moreover, it is a dispute that impacts the declaratory judgment claim.

Second, it does not appear that the parties have engaged in any meaningful discovery. Blockquarry acknowledges that discovery is necessary regarding the ownership question. (Blockquarry Response, at 4 n.1). However, if it had undertaken written discovery or depositions, it would certainly have made that point in its Response. It did not.

*2. The prejudice any resulting delay might cause the other parties.*

Blockquarry states that it would be prejudiced from CI's intervention because "[t]he property that Movant claims an interest in is no longer on the Premises nor in the control of Gaffney PBW." (Response, at 8). That is the point of CI's motion to intervene. Blockquarry took CI's property. CI reasonably relied upon the Court's Order that stated no property should be moved without a prior Order from the Court.

Blockquarry further argues that the Court does not need to concern itself about what has happened because future litigation against CI is forthcoming and that litigation "should happen elsewhere." (Blockquarry Response, at 8). Future litigation between Blockquarry and CI regarding the bitcoin mining equipment, however, can only be brought in the Spartanburg Division of this District. The Spartanburg Division is the only place where venue would be appropriate: key fact witnesses regarding the accounting of the bitcoin mining equipment, the security of the same, and the utility payments are all located in Gaffney, CI's property was located in Gaffney, and Blockquarry's property was also apparently located in Gaffney. *See* 28 U.S.C. § 1391(b)(2). Consequently, Blockquarry's argument that the Court should just let this case go so that litigation can proceed elsewhere is hollow. If future litigation must occur, it will most likely have to occur in this Court. But this Court already has a pending claim covering this precise issue.[3]

It is also important to point out that the presence of Gaffney's interpleader claim (now conveniently dismissed) effectively required CI to move to intervene as opposed to initiating a new civil action in the Spartanburg Division of this District. *See* 28 U.S.C. § 2361 (noting that the

---

[3] CI recognizes that an amended scheduling order will need to be entered. The case was filed on April 7, 2023, and the Court's Scheduling Order has never been amended. From filing to trial, the median length of a civil case in the District of South Carolina in 2023 was 44.9 months. https://www.uscourts.gov/sites/default/files/fcms_na_distprofile1231.2023_0.pdf (South Carolina statistics found at page 24). Allowing CI to intervene at this time would not result in this case lasting longer than any other routine civil case in this District.

6

court addressing an interpleader claim may restrain any other civil action relating to the same property).

> 3. *Why the movant was tardy in filing its motion.*

The Court, respectfully, needs to understand that CI believed that once the case was over, that CI would be able to simply retrieve its property from the locked down premises in Gaffney. The Court also respectfully needs to understand that, although a 10% member of CI is a permanent resident of the United States and living in California, (Zhang Decl. ¶¶ 2-14), CI's operations are conducted out of Singapore and China. Therefore, with respect to the procedure of the case, the need for CI to act on its own, notwithstanding its contract with Bit5ive, was somewhat lost in translation.

Blockquarry argues a different (and incorrect) rationale. It paints CI as a party that wanted to allow "Blockquarry and Gaffney BPW litigate its case for it, at great expense, and then to take its cut when the goose was cooked." (Blockquarry Response, at 9). As noted above, it is not apparent what Blockquarry and Gaffney were litigating about as they are not adverse vis-à-vis the utility deposit or the bitcoin mining equipment. Moreover, serving Litchain by publication and obtaining a default judgement is not adversarial litigation, either.

Blockquarry's decision to not seek leave of court to take possession of the bitcoin mining equipment is very important to the timing of CI's motion. Had Blockquarry moved the Court, then CI would have been alerted to the need to intervene at an earlier stage and opposed that motion. Indeed, if a different sequence of events occurred, and Blockquarry publicly disclosed it took the bitcoin mining equipment six months ago, then CI would have likely moved to intervene at that time. The timeline for CI's monitoring of the case is important here. (Zhang Decl. ¶¶ 40-49). It shows why the facts of this case are distinguishable from the facts that weighed against

intervention in *Alt v. United States Environmental Protection Agency*, 758 F.2d 533 (4th Cir. 2014).

These are the relevant facts of *Alt*. Alt ran a chicken farming operation in West Virginia. She was cited by the EPA because "dander, manure, and other fine particulates, had drained from ditches on Alt's farm into nearby streams" when it rained. *Id.* at 589. Alt filed a lawsuit seeking a declaration that the EPA citation was invalid because an "agricultural stormwater" exemption permitted the complained of run-off. *Id.* Within a month of initiating litigation, two pro-farm groups moved to intervene as plaintiffs alongside Alt. Their motions were granted. Five months after the pro-farm groups moved to intervene, "five clean water advocacy organizations likewise moved to intervene in the lawsuits as defendants, alongside the EPA." *Id.* Those motions were also later granted.

The following week after the clean water advocacy groups moved to intervene, the EPA withdrew its citation against Alt. *Id.* at 590. Thereafter, the parties jointly moved for a stay to work on settlement. The settlement failed and the EPA then moved to dismiss Alt's lawsuit on mootness grounds. *Id.* The motion to dismiss was denied. Thereafter, the Court "modified its scheduling order for a second time." *Id.* The plaintiffs later timely filed a motion for summary judgment. The day after that motion was filed, a new party (Chesapeake Bay Foundation ("CBF")) sought to intervene alongside the defendants. That party's motion was denied, and that party appealed as of right. *Id.*

The facts of *Alt* are distinguishable. First, the parties were in a truly adversarial posture. Seven other interested parties had moved to intervene. The parties had litigated toward a summary judgment resolution of the dispute whether the agricultural stormwater exception applied to the runoff from Alt's chicken farm. Second, CBF allowed others (in the words of Blockquarry) to

8

"litigate its case for it," only to show up at the end. Third, CBF admitted that it made a conscious decision to wait until the case progressed before acting. *Id.* at 591.

It is against the backdrop of those facts that the Fourth Circuit affirmed the District Court's denial of the motion to intervene. Further, it is against the backdrop of those facts that the District Court commented CBF's motion was "too little, and too late" and the Fourth Circuit noted that the court "was reasonably reluctant to arrest the momentum of the lawsuit so near to its final resolution." *Id.* at 591.

CI does not seek to arrest the momentum of this lawsuit so near to its final resolution; rather, it seeks to obtain a final resolution of the ownership issue. Blockquarry does not want that to occur. The court can make the reasonable inference that that is why Blockquarry opposes the motion.

    B. <u>Denial of the Motion Would Impede or Impair CI's Ability to Protects Its Interest</u>

Blockquarry has physically taken CI's personal property. The Court has jurisdiction over that personal property. Denying CI's motion to intervene will impair or impede CI's ability to protect its property interests. It is as simple as that.

### III. CONCLUSION

Blockquarry's opposition to CI's motion to intervene should be rejected. CI timely acted when it learned key information that gave it a reason to intervene. Accordingly, CI respectfully requests that the Court grant its motion to intervene as a crossclaim defendant and allow it to answer Gaffney's remaining declaratory judgment claim.

*[SIGNATURE PAGE FOLLOWS]*

|  |  |
|---|---|
|  | Respectfully submitted, |
| March 27, 2024 | **BURL F. WILLIAMS, P.A.** |
|  | /s/ Burl F. Williams<br>Burl F. Williams (D.S.C. Bar No. 10556)<br>201 Riverplace Suite 501<br>Greenville, South Carolina 29601<br>864-546-5035<br>burl@burlfwilliams.com |
|  | *Counsel for Crypto Infiniti LLC* |

10